UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NISREEN KHOKHAR, JESSIE RUBIN AND COURTLAND BUCHANAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CLAIRE SHIPMAN, UNIVERSAL PROTECTION SERVICE LLC D/B/A ALLIED UNIVERSAL SECURITY SERVICES, PINKERTON CONSULTING & INVESTIGATIONS INC., SANDY LAGUERRE, LEO CHANG, VICTOR GARCIA, JOHN/JANE DOE COLUMBIA PUBLIC SAFETY OFFICERS AND/OR SPECIAL PATROLMEN 1-25, and JOHN/JANE DOE ALLIED UNIVERSAL SECURITY OFFICERS 1-10, GREGORY J. WAWRO, JEFFREY W. KYSAR, MICHAEL TING, ELISA KONOFAGOU, LUIS BELLO, PAUL SCHUCHERT, individually and in their official capacities,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**Docket No. ____________** |

Plaintiffs Nisreen Khokar, Jessie Rubin, and Courtland Buchanan, individually and on behalf of all others similarly situated, by and through their attorneys, The Aboushi Law Firm PLLC, Cohen Green P.L.L.C., Forchilli Law PLLC, Ritchin Law PLLC, Kelly Jo Popkin PLLC, and Gideon Orion Oliver hereby complain of Defendants The Trustees of Columbia University in the City of New York ("Columbia" or the "University"), Claire Shipman, Universal Protection Service LLC D/B/A Allied Universal Security Services ("AUS"), Pinkerton Consulting & Investigations Inc. ("Pinkerton"), Sandy Laguerre, Leo Chang, Victor Garcia and John/Jane Doe Columbia Public Safety Officers and/or Special Patrolmen 1-25 and John/Jane Doe Allied Universal Security Officers 1-10, Gregory J. Wawro, Jeffrey W. Kysar, Michael Ting, Elisa Konofagou, Luis Bello, and Paul Schuchert (collectively, "Defendants") as follows:

**INTRODUCTION**

1. Plaintiffs were students at Columbia University. On May 7, 2025, they participated in a brief teach-in demonstration at Butler Library on campus. In response, Columbia Public Safety officers ("CPS"), Columbia's newly-deputized "special patrolmen," and Allied Universal Security guards kettled, confined, and repeatedly and violently assaulted Plaintiffs and hundreds of other students and bystanders for several hours, then had Plaintiffs and dozens of others arrested by the New York City Police Department on false grounds. Columbia then falsely charged Plaintiffs with disciplinary violations of the school's Rules of University Conduct ("CRUC") and, through a disciplinary process stripped of its ordinary procedural protections, sanctioned them and dozens of other students with suspension, expulsion, or degree revocation.

2. Columbia's response to the May 7 teach-in — both the physical violence inflicted by its security personnel that day and the extraordinary disciplinary sanctions that followed — was not an independent exercise of the University's judgment. It was the direct product of a coordinated campaign of coercion by the Trump Administration, which had frozen hundreds of millions of dollars in federal funding and expressly conditioned its restoration on Columbia arming its security force with arrest powers and imposing "meaningful discipline" defined by the federal government as "expulsion or multi-year suspension" on students who protested in solidarity with Palestinians. Columbia fully capitulated, and Plaintiffs and the Class paid the price.

3. Plaintiffs bring this action on behalf of themselves and a Class of all persons subjected to Defendants' unlawful conduct on May 7, 2025, to recover damages and to obtain declaratory and injunctive relief for violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution, the New York State Constitution, the New York City

Administrative Code, New York common law, and Columbia's own contractual obligations to its students.

**JURISDICTION AND VENUE**

4. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

5. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and because Defendants reside and/or are subject to personal jurisdiction in this district.

7. This Court has personal jurisdiction over Columbia because it is located and operated in New York, New York. Fed. R. Civ. P. 4(k)(1)(A).

8. This Court has personal jurisdiction over AUS because it contracts to supply security guard services in New York State, including at Columbia, and because the tortious acts alleged herein were committed in this district. Fed. R. Civ. P. 4(k)(1)(A).

9. This Court has personal jurisdiction over the individual Defendants because, upon information and belief, each resides in and/or was at all relevant times employed in New York State, and because the acts complained of herein occurred in this district.

10. Plaintiffs assert the following claims pursuant to the United States Constitution, the New York State Constitution, 42 U.S.C. § 1983, New York City Administrative Code §§ 8-801 et seq., New York State common law, and New York contract law.

11. Defendant Columbia was acting at the direction of, and pursuant to significant encouragement and coercion from, the United States government in its policing, security, and disciplinary practices. To meet the demands of the federal government, Columbia requested that its employees be appointed by the New York Police Department as special patrolmen subject to the orders of the police commissioner. A sufficient nexus existed between the federal and local governments and the conduct at issue here to render it state action subject to the protections of the U.S. Constitution and 42 U.S.C. § 1983. See *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001).

12. These special patrolmen were appointed, trained, and deputized by the New York Police Department, authorizing them to conduct arrests and use physical force as police officers. Such activity has traditionally been the "exclusive, or near exclusive, function of the State," sufficient to render their activity as state action. *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014).

## **JURY DEMAND**

13. Plaintiffs demand a trial by jury on all issues so triable.

## **PARTIES**

14. Plaintiff Nisreen Khokar was at all relevant times a student at Columbia University and a resident of New York County, New York. On May 7, 2025, Plaintiff participated in the Butler Library teach-in described herein, was confined against her will inside Room 301 of Butler Library for hours, was subjected to physical force by Columbia Public Safety and/or Allied Universal personnel, was arrested by the NYPD, suspended the next day with no due process and in violation of the CRUC, and was thereafter charged and sanctioned by Columbia under the CRUC, receiving a two-year suspension with no guarantee of reenrollment.

15. Plaintiff Jessie Rubin was at all relevant times a student at Columbia University and a resident of Kings County, New York. On May 7, 2025, Plaintiff participated in the Butler Library teach-in described herein, was confined against her will inside Room 301 of Butler Library for hours, was subjected to physical force by Columbia Public Safety and/or Allied Universal personnel, was arrested by the NYPD, suspended the next day with no due process and in violation of the CRUC, and was thereafter charged and sanctioned by Columbia under the CRUC, receiving a two-year suspension with no guarantee of reenrollment.

16. Plaintiff Courtland Buchanan was at all relevant times a student at Columbia University and a resident of New York County, New York. On May 7, 2025, Plaintiff participated in the Butler Library teach-in described herein, was confined against his will inside Room 301 of Butler Library for hours, was subjected to physical force by Columbia Public Safety and/or Allied Universal personnel, was arrested by the NYPD, suspended the next day with no due process and in violation of the CRUC, and was thereafter charged and sanctioned by Columbia under the CRUC, receiving a two-year suspension with no guarantee of reenrollment.

17. Defendant The Trustees of Columbia University in the City of New York ("Columbia" or "the University") is the legal name of Columbia University, a private not-for-profit university based in New York, New York. Columbia is composed of various graduate and undergraduate constituent schools, including Columbia College, the School of General Studies, the School of Social Work, the Graduate School of Architecture, Planning and Preservation, the School of Nursing, the School of Professional Studies, the School of Engineering and Applied Science, the School of the Arts, the Graduate School of Arts and Sciences, the School of Law, and the Mailman School of Public Health.

18. Defendant Clair Shipman served as interim president of Columbia University from March 28, 2025 until July 1, 2026. Prior to appointment to this post, she was co-chair of the Columbia University Board of Trustees. Upon information and belief, Defendant Shipman ordered the detainment of Plaintiffs and directed the conduct of Columbia Public Safety on May 7, 2025, was personally involved in the University's decision to capitulate to the coercion of the federal government and in the deputization of Columbia Public Safety officers as special patrolmen, was improperly involved in the selection of University Judicial Board panelists and directed the issuance of disproportionate disciplinary sanctions, issued public statements that caused reputational damage and mental and emotional distress to Plaintiffs, and was otherwise instrumental in the violations of Plaintiffs' rights.

19. Defendant Universal Protection Service LLC D/B/A Allied Universal Security Services ("AUS") contracted with Columbia to provide security guard services on Columbia's campuses, including Butler Library, where the incidents complained of herein occurred. Upon information and belief, AUS personnel worked alongside, and under the direction of, Columbia's Department of Public Safety on May 7, 2025.

20. Defendant Pinkerton Consulting & Investigations Inc. ("Pinkerton") provides security to commercial and corporate clients. Pinkerton is headquartered at 101 North Main Street, Suite 300, Ann Arbor, MI. 48104.

21. Upon information and belief, at all relevant times hereinafter mentioned, Defendant Pinkerton contracted with Defendant Columbia to provide security and related services at Columbia's campuses, including the campus and building where the incident complained of herein occurred.

22. Defendant Sandy Laguerre was, upon information and belief, at all relevant times an officer of Columbia's Department of Public Safety and/or a "special patrolm[a]n" appointed pursuant to New York Criminal Procedure Law § 2.10(27). Laguerre is identified by name in eyewitness video and testimony as the officer who, while physically blocking a required exit from Room 301 with her body, told a protester attempting to leave that the blocked exit was "not a fire hazard" and that "nobody is coming in or out." She is sued individually and in her official capacity.

23. Defendant Leo Chang was, upon information and belief, at all relevant times an officer of Columbia's Department of Public Safety and/or a "special patrolm[a]n" appointed pursuant to New York Criminal Procedure Law § 2.10(27). Chang is identified by name in eyewitness testimony and recorded audio as the officer who, when informed that students inside Room 301 required medical attention, including for a concussion, responded that he had "been told that [he] cannot bring them into this environment" and that his "bosses" had instructed that "nobody can come in." He is sued individually and in his official capacity.

24. Defendant Victor Garcia was, upon information and belief, at all relevant times a contractor providing security services at Columbia on behalf of Pinkerton, AUS and/or Columbia. Defendant Garcia is identified by eyewitness testimony as the individual who pushed a protester to the ground between his legs, moved his knees against the protester's exposed torso, stated "that's what you all wanted, right?" and attempted to block a bystander from filming the encounter. He is sued individually and in his capacity as an agent of AUS and/or Columbia.

25. Defendants John/Jane Doe Columbia Public Safety Officers and/or Special Patrolmen 1-25 are, upon information and belief, individuals who were at all relevant times officers of Columbia's Department of Public Safety and/or "special patrolmen" appointed pursuant to New York Criminal Procedure Law § 2.10(27), whose identities are not presently known to

Plaintiffs but who personally participated in the unlawful kettling, use of force, false imprisonment, and denial of medical care described herein, including but not limited to the officers who blocked and later handcuffed the exits to Room 301, pushed, struck, and threw protesters to the ground, pulled protesters' clothing and face coverings, and denied entry to CUEMS and outside EMS personnel. They are sued individually and in their official capacities, and Plaintiffs will amend this Complaint to name them once their identities are ascertained through discovery.

26. Defendants John/Jane Doe Allied Universal Security Officers 1-10 are, upon information and belief, AUS security guards whose identities are not presently known to Plaintiffs but who personally participated in blocking exits and using physical force against protesters on May 7, 2025, including the AUS officer who pulled a demonstrator's keffiyeh around their neck, causing them to fall. They are sued individually and in their capacities as agents of AUS and/or Columbia.

27. Gregory Wawro is Columbia's Rules Administrator and was appointed to that role by then-Interim President Katrina Armstrong in fall 2024. Defendant Wawro oversees the Office of Rules Administration and controls whether complaints proceed to UJB charges. His role involves managing complaints, investigating violations of the Rules of University Conduct, and working with the University Judicial Board on disciplinary cases including all disciplinary cases from Butler Library, including serving in a prosecutorial role.

28. Defendant Jeffrey W. Kysar is a professor of mechanical engineering and otolaryngology/head and neck surgery at Columbia. He served on the University Judicial Board panel that deprived the Disciplinary Subclass of Plaintiffs of due process and issued disproportionate disciplinary sanctions.

29. Defendant Michael Ting is a professor of political science and of international and public affairs in Columbia's School of International and Public Affairs. He served on the University Judicial Board panel that deprived the Disciplinary Subclass of Plaintiffs of due process and issued disproportionate disciplinary sanctions.

30. Defendant Elisa Konofagou is the Robert and Margaret Hariri Professor of Biomedical Engineering and Professor of Radiology (Physics) in Columbia's Fu Foundation School of Engineering and Applied Science. She served on the University Judicial Board panel that deprived the Disciplinary Subclass of Plaintiffs of due process and issued disproportionate disciplinary sanctions.

31. Defendant Luis Bello is the deputy chief information officer in the Columbia School of Law. He served on the University Judicial Board panel that deprived the Disciplinary Subclass of Plaintiffs of due process and issued disproportionate disciplinary sanctions.

32. Defendant Paul Schuchert is the Associate Vice President for Finance and Human Resources in the Columbia College of Arts and Sciences. He served on the University Judicial Board panel that deprived the Disciplinary Subclass of Plaintiffs of due process and issued disproportionate disciplinary sanctions.

33. Defendants Kysar, Ting, Konofagou, Bello, and Schuchert are collectively referred to as the "UJB Defendants."

34. At all times hereinafter mentioned, the individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages, and/or practices of the State or City of New York, and within the scope of their employment by Columbia, Pinkerton and/or AUS.

35. Each of the Defendants was responsible, in whole or in part, for the planning, creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices, and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

36. At all times relevant herein, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or undertaken with deliberate indifference to or reckless disregard for the natural and probable consequences of their acts and/or omissions.

## STATEMENT OF FACTS SIMILAR FOR ALL CLASS MEMBERS

### A. THE FEDERAL GOVERNMENT CONDITIONS COLUMBIA'S FUNDING ON HARSHER POLICING AND DISCIPLINE OF PRO-PALESTINIAN PROTEST

37. On March 3, 2025, President Trump's Joint Task Force to Combat Antisemitism announced a review of Columbia's federal contracts and grants because of Columbia's "ongoing inaction" in the face of alleged antisemitic harassment during "encampments and demonstrations."[1]

38. The following day, President Trump posted on Truth Social that "[a]ll Federal Funding will STOP for any College, School, or University that allows illegal protests…American students will be permanently expelled."

---

[1] The Trump Administration's pretextual use of protecting students against alleged antisemitism to justify suppression of political speech criticizing the Israeli government runs afoul of well-settled First Amendment principles. *See e.g. Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 260-61 (S.D.N.Y. 2025), *reconsideration denied sub nom. Gartenberg v. Cooper Union for Advancement of Sci. & Art*, No. 24 CIV. 2669 (JPC), 2025 WL 602945 (S.D.N.Y. Feb. 25, 2025) (analyzing whether allegations of pro-Palestinian protest is actionable antisemitic harassment under Title VI and finding that "a statute that burdens protected speech must comport with the First Amendment regardless of whether it does so directly, such as by prohibiting certain speech outright, or indirectly" and "requiring schools to censor or punish political speech to avoid liability for a hostile environment would burden not only their students' freedom of expression, but the academic freedom of the institution itself.")

39. On March 7, 2025, the Task Force announced the cancellation of $400 million in federal grants to Columbia because of its "continued inaction," which press coverage widely understood to be a direct response to Columbia's handling of pro-Palestinian protests, including the April 2024 occupation of Hamilton Hall.

40. That same day, then-Interim President Katrina Armstrong met with U.S. Secretary of Education Linda McMahon, who publicly stated "the Trump Administration will not allow continued harassment," a reference to the pro-Palestinian protests the Task Force repeatedly improperly conflated with antisemitism. Hours later, Armstrong emailed the Columbia community stating the University would work with the federal government to address its "legitimate concerns," with particular emphasis on the disciplinary process.

41. On March 13, 2025, the Task Force sent Columbia a letter formalizing nine "precondition[s] for formal negotiations regarding [Columbia's] continued financial relationship with the United States government," with a one-week deadline (the "March 13 Letter"). The March 13 Letter demanded, among other things, that Columbia "expand the number of Columbia security personnel and grant[] them the ability to arrest and remove" students, and that Columbia "complete disciplinary proceedings for Hamilton Hall and encampments," expressly defining "meaningful discipline" as "expulsion or multi-year suspension" (emphasis in original). The March 13 Letter further demanded that Columbia abolish the independent University Judicial Board ("UJB") and centralize disciplinary authority under the Office of the President.

42. One week later, on March 21, 2025, Columbia issued a letter titled "Advancing Our Work to Combat Discrimination, Harassment, and Antisemitism at Columbia" (the "March 21 Letter"), announcing its capitulation to the federal government's preconditions. The House Committee on Education and Workforce posted on X that day: "Columbia FOLDS."

43. Pursuant to the March 21 Letter, the NYPD Police Commissioner appointed at least 36 Columbia University employees as “special patrol[men]” under New York Criminal Procedure Law § 2.10(27), after those employees underwent the NYPD's application process. As special patrolmen, these officers are “subject to the orders of the police commissioner,” “possess all powers and discharge all the duties” of NYPD patrol officers, are authorized to arrest individuals and issue summonses and Desk Appearance Tickets, and must otherwise “obey all the rules and regulations of the [NYPD] and conform to its general discipline” Columbia deployed at least 25 of these newly-empowered special patrolmen on campus beginning May 5, 2025.[2]

44. In addition to placing members of its security force under the control of the police commissioner with the power to arrest, detain and remove students, Columbia also imposed the exact disciplinary sanctions against the Hamilton Hall protesters demanded by the federal government, unilaterally altered the disciplinary process governing protest, instituted a mask ban, and altered curriculum and faculty governance in the Middle East, South Asian, and African Studies department.

45. As a direct result of this capitulation, Columbia entered negotiations for restoration of nearly half a billion dollars in federal funding.

46. On March 24, 2025, the U.S. Department of Education issued a press release entitled “ED, HHS, and GSA Respond to Columbia University’s Actions to Comply with Joint Task Force Pre-Conditions,” in which the Secretary of Education Linda McMahon praised Respondent, stating “Columbia is demonstrating appropriate cooperation with the Trump Administration’s *requirements*,” and specifically included among those requirements “[p]lacing

---

[2] Jonathan Allen, *Columbia University adds 36 new campus patrol officers with powers of arrest,* Reuters, April 4, 2025, available at https://www.reuters.com/world/us/columbia-universitys-new-campus-patrol-officers-appointed-by-new-york-police-2025-04-04/

the University Judicial Board (UJB) under the Office of the Provost and limiting panel membership to faculty and administrators only" and "[e]xpanding the number of Columbia security personnel and granting them the ability to arrest and remove agitators."

47. On April 1, CU Public Safety announced a new identification rule where "[i]ndividuals who refuse either to provide ID or facilitate identification will be warned that noncompliance may result in removal from campus" and "[c]ontinued refusal will result in a second warning, a trespass notice, and escort from campus" where "[t]hose who resist removal may be removed by an authorized individual and subject to arrest for trespassing."

**B. THE MAY 7, 2025 TEACH-IN AND COLUMBIA'S VIOLENT, HOURS-LONG RESPONSE**

48. On May 7, 2025, at approximately 3:17 p.m., a group of Columbia students entered Room 301 (the Lawrence A. Wien Reading Room, "the Room") of Butler Library and began a teach-in and protest, symbolically renaming the space the "Basel al-Araj Popular University" after a Palestinian writer and educator, advocating that Columbia divest from companies with ties to the war in Gaza. Some students already studying in the Room joined the demonstration or engaged with the materials distributed by the protesters; others continued their coursework undisturbed. The action was, by design, a short-duration educational teach-in, not an occupation or lockdown of the Room or the building. At no time did the protest participants restrict ingress or egress. For several hours prior to the start of the protest, dozens of campus security officers were present in Butler Library, clearly aware that a protest was planned. They did nothing to stop protest participants, who were chanting in the halls, from entering the Room. At approximately 3:22 p.m., within minutes of the start of the protest, Columbia Public Safety officers, some or all of whom were special patrolmen, and AUS security guards began blocking the Room's central exit.

49. At approximately 3:31 p.m., Public Safety began closing off the west-side exit of the Room without any announcement or notice to students inside.

50. At approximately 3:37 p.m. roughly twenty minutes after the teach-in began, and before any Public Safety officer or University Delegate had issued any order to disperse, the demonstrators ended the protest, gathered their belongings and began walking peacefully toward the west-side exit to leave voluntarily. Public Safety and AUS officers responded by fully shutting and locking the doors the moment they realized students intended to leave, trapping the students inside against their will.

51. When students then attempted to exit through the main doors, a line of Public Safety and AUS officers began aggressively pushing students backward, shoving them to the ground, and grabbing them by their clothing, injuring several and intentionally preventing their dispersal, even as students chanted "Let Us Out" and similar demands evidencing their clear intent to leave.

52. When a student asked Defendant Sandy Laguerre, who was physically blocking the entryway with her body, whether obstructing the exits was a fire hazard, Defendant Laguerre responded, "No, it's not a fire hazard. Nobody is coming in or out." However, officers selectively allowed non-protesting students to leave without identifying themselves.

53. By approximately 3:55 p.m., Public Safety had kettled students inside the Room, a crowd-control tactic so dangerous that the New York Attorney General, the Legal Aid Society, and the NYCLU secured an agreement[3] barring the NYPD from using it against protesters. Officers gave protesters conflicting and coercive instructions: when one student asked an officer to let her "tap" her ID and leave, she was told "No!" Fear generated by this treatment, combined

---

[3] Ex. A, Joint Motion to Dismiss, Stipulated Order at 13, *In Re Summer Policing* 20 Civ. 8924 (SDNY September 05, 2023) https://ag.ny.gov/sites/default/files/settlements-agreements/nypd-agreement.pdf, ECF No. 1099-1.

with the physical violence already inflicted, led many students to distrust that "tapping out" would be safe, and they declined to do so.

54. Additionally, federal government officials, including President Trump, had recently made statements that students participating in pro-Palestinian protests would be deported or criminally charged. Students reasonably feared that providing identification would carry serious repercussions far beyond campus discipline, and they knew Columbia's CRUC and newly issued identification policy did not permit Public Safety to detain them simply for refusing to show identification.

55. At approximately 4:10 p.m., Public Safety officers pushed two protesters to the ground, inflicting injuries on both, including a diagnosed concussion. Two additional protesters were physically restrained and violently arrested. Video evidence shows one student being pushed to the ground while officers stepped on and around her body and pulled her clothing off; officers, including Defendant Victor Garcia knelt and pressed their knees against protesters' exposed torsos while onlookers screamed for them to stop. Multiple protesters were yanked and thrown from the reading room into the lobby, where as many as six officers encircled and struck, scratched, clawed, punched, and kicked them, leaving them disoriented, bruised, and with their clothing torn.

56. During this same period, officers grabbed at protesters' face coverings and keffiyehs, in one instance pulling a student's latex head covering and body to the floor, and in another pulling a student's keffiyeh around their neck, causing them to fall as well.

57. Beginning at approximately 4:11 p.m. and continuing for hours, Public Safety officers, including Defendant Leo Chang, repeatedly denied requests for medical attention from onlookers, faculty, and students despite mounting reports of concussions and other injuries. When faculty and students told Chang that students inside the Room were injured and needed medical

attention, he responded by asking, "Are these students going to show ID?" and stated, "If they're not going to show ID, we're not going to let them out," and refused even to allow medics into the Room. This conduct violated Columbia's own Department of Public Safety Use of Force Policy, which required Public Safety supervisors to "ensure [an injured] subject receives proper medical attention immediately," and separately provided that "[f]ailure to intervene in the use of excessive force, or to report excessive force, or failure to request or to ensure timely medical treatment for an individual is serious misconduct."[4]

58. At approximately 5:16 p.m., a student was violently arrested and had their face covering ripped off, sustaining a head injury; another student was thrown against a bookshelf, sustaining a concussion. Public Safety continued to falsely tell bystanders outside the Room that no students had been injured.

59. At approximately 5:20 p.m., EMS personnel called to treat a student's concussion were denied entry to the Room by Public Safety.

60. At approximately 5:35 p.m., a building-wide fire alarm sounded throughout Butler Library. Public Safety made no announcement regarding the alarm and made no attempt to evacuate the Room or the building, in direct violation of Columbia's Public Safety Emergency Response Protocols, which mandate "total building evacuation whenever the building interior fire alarm sounds,"[5] and in violation of New York City Fire Code §§ 1027.2 and 1027.3.4, which make it unlawful to obstruct or impede required means of egress.

---

[4] Columbia's Use of Force Policy
https://publicsafety.columbia.edu/sites/publicsafety.columbia.edu/files/content/Columbia%20DPS%20Use%20of%20Force%20Policy.pdf (last visited September 16, 2026)
[5] Columbia University Department of Public Safety
https://publicsafety.columbia.edu/sites/publicsafety.columbia.edu/files/content/ERP_MS_2019.pdf
(last visited September 16, 2026)

61. Rather than evacuate, Public Safety officers handcuffed the library's front doors shut while the alarm continued to sound, laughed, and made mocking gestures toward students trapped inside, conduct that caused acute fear and panic among student demonstrators aware that student protesters at Barnard had been specifically targeted by a bomb threat just days earlier.

62. At approximately 5:50 p.m., despite student demonstrators presenting with injuries including suspected cervical spine trauma and blunt force head injuries, Public Safety continued to deny entry to Columbia University Emergency Medical Service ("CUEMS") responders, notwithstanding assurances given to concerned faculty and students that CUEMS was already on scene. A Columbia University EMS responder stated that the injuries encountered that day exceeded anything witnessed in nearly two years of service.

63. At approximately 5:57 p.m., a student was pinned to the ground and surrounded by several Public Safety officers while other officers physically prevented students and an identified EMT from reaching him, as he shouted in pain and other students shouted in distress demanding the officers stop.

64. Around 6:00 p.m., after nearly two-and-a-half hours of falsely imprisoning the students, Columbia purportedly issued an electronic notification that the library was closed, but never announced this closure verbally to anyone inside the Room. Students not participating in the demonstration continued to study elsewhere in the library, undisturbed and without any ID check, until at least 6:45 p.m., confirming that Public Safety's identification demands and unlawful confinement were directed exclusively at protesting students as retaliation for their expression, not any genuine building-closure or safety concern.

65. Pursuant to the Columbia Rules of University Conduct ("CRUC"), the section of the University Charter that has governed protests and related discipline at Columbia for decades,

Delegates are appointed individuals with the "authority for enforcement of" the CRUC who are to "warn individuals and groups whose actions may violate" the CRUC and can order dispersal of a protest.[6] It was nearly three hours after the protest began before Delegates were permitted to enter the Room.

66. Around 6:20 p.m., a Delegate issued a warning without properly identifying herself and without sound amplification, rendering it inaudible to most of the Room; the Delegates left after only four minutes without requesting identification from any demonstrator or specifying which Rule any demonstrator was allegedly violating, as required by the Rules of University Conduct and the Guidelines thereto.

67. At approximately 6:29 p.m., Public Safety again denied entry to an EMS worker seeking to reach room 301.

68. At approximately 7:00 p.m., faculty negotiators were allowed to enter the Room but were promptly escorted out at 7:05 p.m. when NYPD officers arrived.

69. At approximately 7:08 p.m. after the Defendants had unlawfully imprisoned the students for nearly four hours, NYPD's Strategic Response Group entered the Room and deployed a Long-Range Acoustic Device (LRAD), preempting any further Public Safety announcement. Approximately 17 students left by presenting identification; the remaining 81 individuals, including Plaintiffs, were lined up and arrested, including at least one protestor suffering from a concussion who was moved separately to the first floor before being arrested.

70. Outside the library, NYPD officers used additional force against bystanders and press, including chasing and pinning protesters to the ground, pushing protesters against buildings,

---

[6] Rules of University Conduct https://universitypolicies.columbia.edu/content/rules-university-conduct (last visited September 16, 2026)

punching a protester in the face from behind a barricade, and grabbing a protester by the neck and chest; NYPD officers separately shoved multiple student journalists covering the events.

71. Plaintiffs were arrested and charged with misdemeanor trespassing despite having entered the library on their own campus through the front doors during open hours and remained there when police arrived only because Columbia detained them by force. Ultimately, plaintiffs plead guilty to an administrative violation for disorderly conduct under New York Administrative Code 10-179 (a)(6)V, and their arrests and charges were sealed.

72. Despite repeatedly demanding to be allowed to leave, Plaintiffs and the Class were confined against their will, without their consent, inside Room 301 for several hours, without water, access to medication, or adequate medical care, based solely on Public Safety's unlawful demand that they identify themselves as a condition of leaving. This condition negated the dispersal order and prevented students from complying although they continued to demand they be permitted to leave.

73. In addition, Columbia's demand to present identification had no basis in the CRUC, which permits a Delegate (not a Public Safety officer) to request identification from an individual "believed to be violating" the Rules at a demonstration, and even Columbia's newly issued identification policy authorized only removal from campus for non-compliance, not confinement.

**C. COLUMBIA'S CRACKDOWN WAS A DIRECT RESPONSE TO FEDERAL PRESSURE**

74. The May 7 demonstration occurred while Columbia was engaged in high-stakes negotiations with the Trump Administration over the restoration of federal funding and the preservation of institutional autonomy.

75. On May 8, 2025, the day after the incident, the Trump Administration publicly praised Columbia's "strong and resolute" response, stating that Defendant Interim President Claire

Shipman "has met the moment with fortitude and conviction."[7] The Department of Education's Joint Task Force to Combat Anti-Semitism stated it was "encouraged" and "confident that Columbia will take the appropriate disciplinary actions for those involved in this act." In addition, Secretary Rubio posted on X "We are reviewing the visa status of the trespassers and vandals who took over Columbia University's library. Pro-Hamas thugs are no longer welcome in our great nation.[8]

76. On May 23, 2025, Defendant Shipman publicly reassured the federal government that Columbia had "streamlin[ed] disciplinary processes to respond swiftly to violations of [the CRUC]" and "will act firmly," and Columbia publicly listed its "quick actions to respond to and investigate the May 7, 2025 disruption of Butler Library" as an example of its compliance efforts[9].

77. On July 23, 2025, Columbia announced it had reached a settlement agreement with the federal government. Columbia's own Knight First Amendment Institute characterized the settlement as coming "at a very steep price to Columbia's autonomy and to the constitutional freedoms of Columbia's faculty, staff, and students," warning that "[t]he federal government is seeking to reshape the internal operations of universities not through generally applicable directives, but rather through a series of bilateral 'deals.'"

78. Five United Nations Special Rapporteurs on human rights later concurred, expressing "concern over the coercive measures taken by the US government against universities and the consequent actions by, for instance, Columbia University," and "deep concern at the

---

[7] U.S. Department of Education Joint Task Force to Combat Anti-Semitism Statement Regarding Columbia University https://www.ed.gov/about/news/press-release/joint-task-force-combat-anti-semitism-statement-regarding-columbia-university (last visited September 16, 2026)

[8] Secretary Mark Rubio (@SecRubio) X (May 7, 2025, 9:44 PM) https://x.com/SecRubio/status/1920293818194178397

[9] Claire Shipman, An Update from Acting President Shipman on Our Commitment to Combatting Antisemitism, May 23, 2025 https://president.columbia.edu/news/update-acting-president-shipman-our-commitment-combatting-antisemitism (last visited September 16, 2026)

political pressure exerted on university administrators and academics to take certain positions and actions regarding the student protests on campuses on the situation in Gaza." The letter specifically addressed Columbia's violent response to the teach-in at Butler Library and further admonished Columbia for alleged human rights violations stemming from the "alleged arbitrary arrest and physical assault of students who were assembling peacefully at Columbia University on 7 May 2025."[10]

79. The direct and coercive interference of the federal government in Columbia's policing and discipline of pro-Palestinian protest as well as the appointment of its Public Safety Officers as "special patrolmen" subject to the control of the NYPD rendered Columbia's conduct state action subject to the full protections of the U.S. and New York Constitutions.

## D. COLUMBIA DISCIPLINED PLAINTIFFS AND DOZENS OF OTHER STUDENTS WHO PARTICIPATED IN THE TEACH-IN

80. On May 7, the same day as the Butler Library action, Columbia's Trustees ratified the changes to the CRUC in a set of resolutions that backdated the changes to March 21, 2025. These changes included the removal of students from UJB panels adjudicating discipline relating to protest and giving the provost, who reports directly to Defendant Shipman, the authority to appoint the panelists rather than the elected University Senate, which includes faculty, staff and students and is insulated from the president's control.

81. The resolutions were enacted without University Senate review and approval, in violation of the Respondent's Charters and Statutes that state, pursuant to § 452(c), any changes

[10] Mandates of the Special Rapporteur on the situation of human rights defenders; the Special Rapporteur on the right to education; the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression; the Special Rapporteur on the rights to freedom of peaceful assembly and of association and the Special Rapporteur on the human rights of migrants, October 14, 2025, https://spcommreports.ohchr.org/TMResultsBase/DownLoadPublicCommunicationFile?gId=30402 (last visited September 17, 2026)

to the Rules or UJB must be passed by the University Senate before moving to the Trustees for approval.

82. The University Senate Committee on the Rules of University Conduct, the body authorized by the University Charter to implement and interpret the CRUC, issued an objection to these "significant changes" made "in response to a letter from the federal government" and stated "[t]his course of action troubles us greatly. The UJB is a direct result of the Rules of University Conduct. And the text of § 452(c) makes clear that "[a]ll changes in these Rules shall be passed by the University Senate for approval and acceptance by the Trustees in accordance with the Statutes of the University….The proposition that the Trustees are not bound by the Statutes, meanwhile, is inconsistent with basic premises of shared governance and the internal rule of law."[11]

83. Beginning the day after the May 7 protest, Defendant Wawro investigated Plaintiffs and dozens of other students with violations of the CRUC arising from their presence at or participation in the May 7, 2025 teach-in.

84. Also on May 8, Defendant Wawro imposed interim suspensions and other restrictions on those students pending investigation with no due process in violation of the CRUC. Columbia's immediate interim suspensions prevented dozens of students from completing spring coursework and attending graduation, restricted their access to campus, fired them from their campus employment, evicted them from housing with little or no notice, and even eliminated their meal plans, causing food and housing insecurity, all without any due process.

---

[11]See *Columbia University Senate Plenary Meeting Minutes, Rules Committee Update on UJB Announcements* at 1 (May 2, 2025) https://senate.columbia.edu/sites/senate.columbia.edu/files/content/Plenary%20Binders%202024-25/US_Plenary%20Binder_20250502-R-PP.pdf (last accessed September 17, 2026); *see also* August Philips and Sarah Huddleston, *After promise to Trump, Columbia alters disciplinary hearing process without University Senate approval*, Columbia Daily Spectator (June 12, 2025), available at https://www.columbiaspectator.com/news/2025/06/12/after-promise-to-trump-columbia-alters-disciplinary-hearingprocess-without-university-senate-approval / (last accessed September 17, 2026)

85. Upon information and belief, the interim suspensions were imposed at the direction of Defendant Shipman.

86. Pursuant to the guarantee in CRUC § 446 that the student has the right to "request access to University… camera footage that can be used in one's defense," Plaintiffs requested access to the CCTV footage from May 7 in order to present a complete argument in their defense. Columbia notified Plaintiffs via email that a request for video evidence "[could not] be accommodated," without further explanation. During hearings, Defendant Wawro, who heavily relied on the same footage in prosecuting the disciplinary charges, stated that the request could not be accommodated because it was too expansive. Plaintiffs requested CCTV footage again during the appeals process—including a narrowed request only for footage captured in Butler Library between 3:00pm and 7:30pm on May 7th—and were again denied without explanation in clear violation of the CRUC.

87. Two days before the start of the group hearings, Plaintiffs discovered that Columbia had taken down the Rules webpage, which was later restored on June 25, the first day of hearings and noted the "Latest Policy Revision" date as June 23, 2025. This revision removed the requirement that the UJB panel include at least one student member and replaced the University Senate Committee on Rules, the "statutory custodian of the Rules" pursuant to the University Charters, with the Office of the Provost, which reports directly to the Defendant Shipman and the Board of Trustees, as demanded by the federal government. On June 28, the Rules webpage was changed back to its original form last amended on September 19, 2019, which required the inclusion of students on the UJB as well as the authority of the University Senate Committee on Rules to oversee the UJB.

88. In late June and early July 2025, Columbia conducted disciplinary hearings before the UJB Defendants, a panel appointed by the Provost at the direction of Defendant Shipman that lacked any student members in violation of the requirements of the CRUC. On July 21, 2025, the UJB Defendants found Plaintiffs and the Disciplinary Subclass responsible for numerous charged violations and imposed sanctions ranging from multi-year suspension to expulsion and degree revocation,[12] sanctions that Plaintiffs and the Disciplinary Subclass contend were procedurally improper, unprecedented in Columbia's history for a protest of this nature, and imposed at the direction of the federal government, as described further in the Claims for Relief below.

## STATEMENT OF FACTS FOR PLAINTIFFS

### NISREEN KHOKAR

89. Plaintiff Nisreen Khokhar is a naturalized citizen and visibly Muslim woman of South Asian background. Ms. Khokhar has worked and volunteered for local and international human rights NGOs and teams including the International Rescue Committee and the U.N. Special Rapporteur on Freedom of Peaceful Assembly and of Association. Ms. Khokhar has done human rights work and volunteering in Amman (Jordan), Baltimore (U.S.), Cairo (Egypt), Detroit (U.S.), New York City (U.S.), and Ypsilanti (U.S.).

90. Ms. Khokhar was accepted to Columbia Law School with a full scholarship of $235,332 in return for dedicating her education and post-graduation years to public service work. At the time of the protest, she was finishing her first year of law school at Columbia Law School and had been accepted to join the Human Rights Clinic for her second year, after a competitive

[12] Columbia's disciplinary determinations and sanctions arising from the May 7, 2025 teach-in are the subject of a separate, pending special proceeding under Article 78 of the New York Civil Practice Law and Rules in the Supreme Court of the State of New York, County of New York. *J. Roe 1 et al v. Trustees of Columbia University* in the City of New York Index No. 166611/2025 (J. Pearlman). Plaintiffs' claims for relief in this action, including Plaintiffs' breach of contract claim are not included in nor precluded by that proceeding. This action does not duplicate the relief sought in that separate proceeding.

application process. In retaliation for participating in the protest, Columbia terminated Ms. Khokhar's scholarship and financial aid. She also lost a competitive internship that had been awarded for her second year of law school.

91. Further, she accepted the offer from Columbia Law School specifically and expressly because it included acceptance in a highly competitive dual degree program that would have allowed her to earn a Master in Economic Law at a French university, an opportunity that Columbia's unlawful conduct has rendered impossible. Ms. Khokhar had already gone through the rigorous application process and been nominated for and offered a spot for international study with the Science Po (Master in Economic Law) Dual Degree program for the 2026-27 academic year. A standalone one-year Master program at Science Po otherwise costs nearly $28,000 and Ms. Khokhar's scholarship was to pay for this program.

92. Ms. Khokhar used her Columbia University ID to swipe into and enter Butler Library in the morning of May 07, 2025. Around 3:15, she entered the Reading Room. Not long after, Public Safety locked all the entrances and exits to the reading room. Ms. Khokhar was trapped and kettled inside the reading room with nearly 80 other students for over four hours, despite repeatedly and consistently asking to be allowed to disperse peacefully.

93. Ms. Khokhar was repeatedly told she was not allowed to leave and was therefore confined inside the reading room against her will and without her consent.

94. Throughout the unlawful imprisonment, Ms. Khokhar witnessed multiple CPS officers violently push students so hard that students fell on top of each other and onto the ground hurting themselves and each other. As a result of Public Safety officers shoving students causing them to fall on top of each other, Ms. Khokhar was pushed and crushed between students. Ms. Khokhar recalls seeing one student shoved to the ground by officer in front of her and trampled

over, caught in the crowd and unable to get up. Ms. Khokhar saw students be aggressively brutalized by CPS.

95. Ms. Khokhar saw students trampled over and aggressively brutalized by Public Safety officers.

96. During the course of the detainment, a fire alarm went off. Despite repeatedly asking, Ms. Khokhar was denied any information regarding whether the students in Butler Library were at risk of an imminent fire safety threat. No evacuation procedures or protocols were undertaken, and Ms. Khokhar, alongside other students, panicked at the possibility of being trapped inside a closed space with no exit and the ongoing threat of a fire.

97. Ms. Khokhar was aware of the Trump Administrations threat to revoke citizenship, prosecute, deport, or otherwise harm students engaged in pro-Palestine speech or protest and was concerned with swiping her ID. Ms. Khokhar was removed from the building in handcuffs by the NYPD and taken into a NYPD police car.

98. Ms. Khokhar was charged with trespass for her presence in her own school's library and found out the same week that she had been interim suspended from Columbia Law School.

99. During her suspension, Ms. Khokhar was unemployed for eight months with no source of income and suffered severe emotional and mental symptoms, forcing her to return to live with her family. She is currently working in Tunisia for the Danish Refugee Council.

100. Under the terms of her sanction, Ms. Khokhar was eligible to apply for early readmission before the full completion of the two-year suspension. While every other similarly situated student who applied was permitted to return based on virtually the same reinstatement package, Ms. Khokhar was denied.

101. As a direct and proximate result of Defendants' conduct on May 7 and the subsequent unlawfully imposed disciplinary sanctions Ms. Khokhar suffered significant damage to her reputation, career, financial future, and mental and emotional health.

**JESSIE RUBIN**

102. Plaintiff Jessie Rubin is a Jewish woman who was in her fifth year of a six-year Ph.D. program in the Columbia University Graduate School of Arts and Sciences studying ethnomusicology. She was also a student worker, and her Columbia employment was her sole source of income and health insurance.

103. Ms. Rubin attended the teach-in with the intention of helping to launch the Basel al-Araj Popular University in Butler Library to learn from peers about Columbia's complicity in the ongoing genocide in Palestine and the Palestine liberation movement.

104. While inside the Reading Room and within minutes of the teach-in starting, Public Safety and Allied security barricaded the doors and refused to let anyone exit, including Ms. Rubin.

105. Ms. Rubin and several students pleaded with CPS to let them leave the room and were denied. Instead, Ms. Rubin was told that she must first swipe her CUID then she would be permitted to leave.

106. Ms. Rubin understood that, because of the Trump Administration's coercion of Columbia to suppress pro-Palestine speech and protest and to impose harsher discipline on students engaged in that constitutionally protected activity, swiping her CUID would result in disciplinary sanctions against her, and that those sanctions would be severe.

107. During the unlawful confinement, Ms. Rubin was physically pushed by a CPS Officer and fell to the ground causing her to experience excruciating pain to her body and difficulty breathing.

108. CPS continued to shove students into one another to prevent them from leaving the Reading Room, using such force that students fell on top of each other. Ms. Rubin was caught in the resulting pile of students, who were screaming, in pain, and confused, with no room to move or breathe. Being shoved by CPS and trapped among the falling students caused Ms. Rubin to experience panic, fear, anxiety, and pain from the physical assault.

109. Ms. Rubin witnessed violent attacks on students by Public Safety officers, including witnessing a student shoved so violently by CPS they were slammed head first into the ground and then were refused medical care until students plead endlessly for it. She witnessed two other students suffer full-blown panic attacks brought on by the fear engendered by Public Safety's violent actions and the deprivation of medical treatment.

110. When the fire alarm began to sound, CPS disregarded the alarm and continued to block the door preventing Ms. Rubin and the other students kettled inside, causing her and others to fear for their lives and that they may be trapped inside the Reading Room during what may have been a fire.

111. Student protestors tried to continue with their lesson plan despite the circumstances, circulating syllabi and readings, and giving talks through a megaphone. The doors remained barricaded until police were let in to arrest them.

112. Ms. Rubin had been awarded a fellowship from Columbia's Heyman Center for the Humanities, which included significant opportunities for faculty mentorship that would have provided substantial long-term career benefits. Columbia revoked this fellowship in retaliation for Ms. Rubin's participation in the protest.

113. Due to her unlawful arrest at Columbia's behest, Ms. Rubin and her father were doxed online, leaving her in a state of fear for her and her family's safety. This threat was

particularly painful because it occurred while her mother was dying of a terminal illness. Columbia did nothing to protect Ms. Rubin and her family, despite its promises in the Columbia Anti-Doxing and Online Harassment Policy.

114. Ms. Rubin attended Barnard College for her undergraduate degree. During that time, Ms. Rubin participated in multiple demonstrations on Columbia's campus including an occupation of Low Library for eight days demanding fossil fuel divestment in 2016, for which she disciplined by the UJB and received only a sanction of writing an apology letter to custodial staff. In 2017, as a member of the student group Students for Justice in Palestine ("SJP"), Ms. Rubin participated in the disruption of an Israeli speaker by storming into the lecture unannounced and disrupting the regularly- programmed event. While this protest resulted in a formal hearing under the CRUC, no sanctions were imposed.

115. Under the terms of her sanction, Ms. Rubin was permitted to apply for early return to Columbia after completing one year of suspension. She returned in the fall of 2026 to complete her thesis. She is afraid to engage in any demonstration, protest or other form of protected speech expressing her pro-Palestine viewpoint for fear of further retaliation from Columbia's administration due to its continued collusion with and capitulation to the federal government.

116. As a direct and proximate result of Defendants' actions, Ms. Rubin has lost approximately $50,000 in income and benefits, as well as suffered severe reputational, financial, physical, and mental harms.

**COURTLAND BUCHANAN**

117. Plaintiff Courtland Buchanan was completing his first year pursuing a Ph.D. in Urban Planning in the Columbia University Graduate School of Architecture, Planning and

Preservation. He was a student worker, and his Columbia employment was a significant source of income and health insurance.

118. Mr. Buchanan arrived in the Reading Room shortly after the teach-in began. He attended the teach-in anticipating that it would be a brief program discussing Basel al-Araj at the conclusion of which all of the students would leave the Room.

119. However, moments later, Mr. Buchanan observed several Public Safety employees blocking the exits in both directions. Mr. Buchanan learned that he and others were being asked to leave and attempted to do so. When he made his way towards the exit, he was told he was not allowed to leave.

120. Each time Mr. Buchanan and other students made their way to the exits, Public Safety officers violently pushed them back and refused to permit them to leave. This cycle occurred at least five times.

121. Each time Mr. Buchanan attempted to leave he was told by CPS that permission to leave was conditioned upon him swiping his CUID.

122. At one point Mr. Buchanan was at the front of the line of students facing CPS and asked that he be permitted to leave. Instead, CPS violently shoved him and other students. He was crushed between students and CPS with such force that his body lifted off the ground.

123. Mr. Buchanan was unable to breathe due to the pressure and force of the crush and chaos caused by CPS violently shoving students. Mr. Buchanan asked CPS officer why he would not let him leave. The officer smiled, and responded "because you're breaking the rules."

124. At one point, a Defendant CPS officer pulled Mr. Buchanan’s kuffiyeh down over his eyes while another Defendant CPS officer John Doe 1 struck him in the head repeatedly causing

his glasses to break. Mr. Buchanan was unable to lift his arms to defend himself or retreat because he was shoved against a crowd of students.

125. Columbia's unlawful retaliation against Mr. Buchanan resulted in the loss of his employment as well as interrupting his education, significantly delaying or potentially destroying his goal to become a professor, causing substantial damage to his professional reputation and the entire trajectory of his career.

126. The trauma and stress inflicted by the events of May 7 and the subsequent unlawfully imposed disciplinary sanctions severely exacerbated pre-existing mental and physical health conditions, resulting in several emergency room visits and a lengthy stay in a residential treatment facility.

127. As a direct and proximate result of Defendants' actions, Mr. Buchanan has lost income of approximately $50,000 and incurred health care expenses in excess of $100,000, in addition to the severe reputational, financial, physical, and mental harms he has suffered.

128. Under the terms of his sanction, Mr. Buchanan was permitted to apply for early return to Columbia after completing one year of suspension. He returned in the fall of 2026. He is afraid to engage in any demonstration, protest or other form of protected speech expressing his pro-Palestine viewpoint for fear of further retaliation from Columbia's administration due to its continued collusion with and capitulation to the federal government.

## **CLASS ACTION ALLEGATIONS**

129. Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek to represent a certified Class consisting of: all persons who, at the time of the teach-in that took place on May 7, 2025 inside Butler Library at Columbia University's Morningside campus, were: (i) arrested; (ii) detained in any fashion, without custodial arrest; (iii) confined

without their consent within Butler Library; (iv) charged with violating the CRUC; (v) disciplined for an alleged CRUC violation; (vi) subjected to any physical force; (vii) subjected to any police or Public Safety action having a chilling effect on protected expression; or (viii) otherwise subjected to any of the policies, practices, or customs alleged in this Complaint (the "Class").

130. For the avoidance of ambiguity, the Class includes persons subjected to any such conduct by employees, agents, or other actors associated with or acting on behalf of Columbia and/or AUS, whether that conduct occurred: (i) as part of an enforcement action directed at the teach-in itself; (ii) because of physical proximity to the teach-in; (iii) because of perceived association with the teach-in; (iv) because of observation of, or any attempt or perceived attempt to document, Columbia Public Safety and/or AUS conduct during the teach-in; or (v) because of any other connection to the teach-in.

131. Plaintiffs further propose, pursuant to Fed. R. Civ. P. 23(c)(5), a Disciplinary Subclass consisting of all Class members who were charged with and/or sanctioned for an alleged violation of the CRUC arising from the May 7, 2025 teach-in, for purposes of the Sixth (New York State Constitution due process), Tenth (federal First Amendment retaliation) Eleventh (federal due process), and Thirteenth (breach of contract) Claims for Relief, which apply only to that subset of the Class subject to Columbia's disciplinary process.

132. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the Class includes well over one hundred individuals who were present in or immediately outside Butler Library on May 7, 2025, including the approximately 81 individuals arrested and the students charged and sanctioned under the CRUC.

133. Joinder is further impracticable because, upon information and belief, some Class members are unaware that their constitutional and statutory rights were violated or that they may

seek redress in court, and many Class members lack the means to retain counsel to pursue an individual civil rights action.

134. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including: whether Defendants unlawfully detained and assaulted Class members in violation of state common law and the state and federal Constitutions; whether the kettling tactic and degree of force used were constitutionally reasonable; whether Class members were denied their Constitutional rights to free speech and to be free from unlawful confinement; whether Defendants' identification demands, confinement, and unprecedented harsh disciplinary sanctions were viewpoint-discriminatory and constituted First Amendment retaliation; and whether Defendants' conduct was state action due to federal coercion and willful participation with local law enforcement.

135. These common questions all flow from the same policies enacted and implemented by the named and unnamed Defendants: Columbia's campus-wide security and disciplinary policies, adopted pursuant to its negotiations with the federal government and carried out by Columbia's and AUS's security personnel, many of whom were appointed special patrolmen under the supervision of the police commissioner. These policies reflect a unitary scheme that violated the constitutional, statutory and common law rights of the Class.

136. Judicial economy and efficiency will be furthered by resolving these common questions on a class-wide basis.

137. Plaintiffs' claims are typical of, and Plaintiffs have no interests antagonistic to, those of the Class: like other Class members, Plaintiffs were engaged in or observing activity protected by the First Amendment, were confined and subjected to excessive force without individualized probable cause, and were thereafter disciplined without due process.

138. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have a strong personal interest in the outcome of this litigation and no conflicts of interest with other Class members.

139. Many Class members desire to participate in Palestine-related protests, where Defendants' challenged policies, practices, and customs remain in effect, and therefore are chilled from the exercise of their First Amendment rights or remain at risk of future harm from those policies absent injunctive relief.

140. Class Representatives are represented by The Aboushi Law Firm PLLC ("Aboushi"), Forchilli Law PLLC, Ritchin Law PLLC, Cohen Green P.L.L.C. ("C&G"), Gideon Orion Oliver and Kelly Jo Popkin PLLC.

141. Tahanie Aboushi has 16 years of experience litigating challenging the NYPD's practice and policies that violate the constitution resulting in policy changes. For example, *Elsayed, v. The City of New York, et al.*, 12-CV-5967(S.D.N.Y.) first individual case challenging the NYPD's removal of religious head coverings during post arrest processing and *Elsayed, et al., v. The City of New York, et al.* 18-cv-10566 (S.D.N.Y) a class action challenging the NYPD's removal of religious head coverings as co-counsel with Beldock, Levine & Hoffman. Ms. Aboushi was lead counsel in *Rolon et al v. City of New York et al.*, 21-cv-02548 (S.D.N.Y) one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, resulting in a historic settlement with the NYPD addressing police response to first amendment activities. Ms. Aboushi is lead counsel in class action *Steadman, et al. v. City of New York, et al.* 25-cv-4081 (E.D.N.Y.) and co-counsel in class action *Makkawi et al. v. City of New York, et al.* 25-cv-06321 (S.D.N.Y.) and *Thompson et al v. Hochul et al.*, 25-cv-06322 (S.D.N.Y.) (with Cohen and Green and Oliver).

142. C&G attorneys have litigated a number of class action and police suits, including, but not limited to: *Sow, et al. v. City of New York, et al*, 21-cv-00533 (S.D.N.Y.) (one of the consolidated cases in *In Re: New York City Policing During Summer 2020 Demonstrations*, (largest settlement amount paid to protestors in US history) (with Oliver); *Jones v. United States Postal Service*, 20-cv-6516 (S.D.N.Y.) (nationwide voting rights class action); *Edrei v. Bratton*, 16-cv-01652 (S.D.N.Y.), aff'd sub. nom. *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark, precedential decision in challenge to NYPD's use of Long Range Acoustic Device ("LRAD") against Black Lives Matter protesters), cert. denied *Maguire v. Edrei*, 139 S. Ct. 2614 (2019) (with Oliver); *Gallagher v. N.Y. State. Bd. of Elections*, 20-cv-5504 (S.D.N.Y.) (New York State voting rights class action). *See also Yang v. N.Y. State Bd. of Elections*, 20-cv-3325 (S.D.N.Y.), aff'd sub. nom. *Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020). C&G attorneys are currently counsel on *Steadman, et al. v. City of New York, et al.* 25-cv-4081 (E.D.N.Y.) and *Makkawi, et al. v. City of New York, et al.* 25-cv-06321 (S.D.N.Y.) (class actions challenging NYPD protest policing policies and practices related to pro-Palestine demonstrations) (with Aboushi and Oliver); as well as *Phillips, et al. v. City of New York, et al.* 21-cv-08149 (S.D.N.Y.)

143. Gideon Oliver has over 20 years of experience litigating civil rights cases against the NYPD, including hundreds of civil rights cases challenging the City's policies, practices, and customs related to protest policing. For example, Oliver was among counsel in *MacNamara, et al. v. City of New York, et al.,* 2004-cv-09216 (S.D.N.Y.) (class action challenging NYPD protest policing policies and practices during 2004 Republican National Convention, which resulted in $18 million settlement) and *In Re: New York City Policing During Summer 2020 Demonstrations* (class action that resulted in the largest settlement amount paid to protestors in US history and changes to NYPD protest policing) (with C+G). He is currently co-counsel (with Aboushi and

C+G) in *Steadman, et al. v. City of New York, et al.* 25-cv-4081 (E.D.N.Y.) and *Makkawi, et al. v. City of New York, et al.* 25-cv-06321 (S.D.N.Y.) (class actions challenging NYPD protest policing policies and practices related to pro-Palestine demonstrations). Oliver is also co-counsel on *Handschu, et al. v. Special Services Division, et al.,* 71 Civ. 2203 (LJL) (S.D.N.Y.) (ongoing class action initiated in 1971 challenging NYPD tactics regarding investigations into political activity, which resulted in a 1985 consent decree). Oliver has also been counsel on a number of precedential appellate cases at the federal and state levels, including *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (landmark decision in challenge to NYPD's use of Long Range Acoustic Device against Black Lives Matter protesters), cert. denied,139 S. Ct. 2614 (2019), *Tardif v. City of New York, et al.,* 991 F.3d 394 (2d Cir. 2021) (granting a new trial in light of incorrect jury instructions in 14th Amendment-based excessive force claim), *People v. Bezjak*, 11 Misc.3d 424 (N.Y.City Crim.Ct.,2006),, *aff'd*, 26 Misc.3d 130(A) (Appellate Term, 1st Dept., 2010) and *People v. Beck*, 26 Misc.3d 42 (Appellate Term, 1st Dept., 2010) (overturning City's parade permitting scheme on constitutional grounds), and *Matter of Gwen Carr, et al. v. de Blasio, et al.,* 197 A.D.3d 124 (1st Dept. 2021) (with District Attorney of New York County Alvin Bragg) (authorizing Eric Garner's mother to pursue a public judicial inquiry into his killing under rarely-used provision of the NYC Charter).

144. Cheryl Forchilli has over 25 years of experience in various areas of legal practice and has represented more than 75 students in Article 78 proceedings seeking to annul Columbia's improperly imposed disciplinary sanctions for pro-Palestine protest, providing substantial knowledge of the events and actions giving rise to the claims herein.

145. Ezra Ritchin has represented Columbia and Barnard students in four Article 78 proceedings challenging the university's disciplinary actions against protesters advocating for

Palestinian human rights. He is co-counsel to the putative class in *Hilgart-Griff et al. v. Regents of the University of Michigan et al.*, 2:24-cv-13425 (E.D. Mich. 2024) and co-counsel for over 40 other individuals in *Hakim et al. v. Regents of the University of Michigan et al.*, 2:25-cv-11265 (E.D. Mich. 2025) and *Boosinger et al., v. Regents of the University of California et al.*, 25STCV08969 (L.A. Super. Ct. 2025) -- all cases challenging university repression of pro-Palestinian speech and activism. Ezra has also served as class counsel in *Tucker et al. v. King County*, 2:24-cv-00002 (W.D. Wash. 2024), a case that challenged unconstitutional jail and police policies, and has represented multiple people in fighting unlawful NYPD practices.

146. Kelly Jo Popkin has over nine years of experience in civil rights litigation, including multiple class actions and mass tort cases alleging constitutional violations. Popkin has also represented multiple Columbia and Barnard students in their disciplinary proceedings and Article 78 cases challenging the sanctions levied against them for their pro-Palestine protest activity. As such, Popkin has extensive knowledge of the events giving rise to this Complaint as well as Columbia's history of tortious misconduct toward, and outright suppression of, pro-Palestine viewpoints.

147. Plaintiffs' counsel's firms have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the Class or between the attorneys and members of the Class.

148. A Damages Class should be certified under Rule 23(b)(3) because common questions predominate over individual ones and a class action is superior to other available methods for fair and efficient adjudication.

149. An Injunctive Class should be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, making class-wide declaratory and injunctive relief appropriate.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### N.Y.C. Admin. Code §§ 8-801, *et seq*. ("Qualified Immunity Repeal" Act) Against Defendants Laguerre, Chang, Garcia, John/Jane Doe Columbia Public Safety Officers 1-25, Columbia, AUS, AUS John/Jane Does 1-10, and Pinkerton.

150. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

151. New York City Administrative Code § 8-803(a) through (c) provides as follows, in relevant part:

a. "A covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable to the person aggrieved for legal or equitable relief or any other appropriate relief."

b. "The employer of a covered individual who, under color of any law, ordinance, rule, regulation, custom or usage, subjects or causes to be subjected, including through failure to intervene, any other natural person to the deprivation of any right that is created, granted or protected by section 8-802 is liable, based upon the conduct of such covered individual, to the person aggrieved for legal or equitable relief or any other appropriate relief."

c. "A person aggrieved may make a claim pursuant to subdivision a of this section in a civil action in any court of competent jurisdiction by filing a complaint setting forth facts pertaining to the deprivation of any right created, granted or protected by section 8-802 and requesting such relief as such person aggrieved considers necessary to insure the full enjoyment of such right."

152. A "covered individual" under § 8-801 means "(i) an employee of the police department or (ii) a person who is appointed by the police commissioner as a special patrolman." Upon information and belief, Defendants Laguerre, Chang, Garcia, and the Doe Public Safety Officer Defendants were each appointed as special patrolmen and are therefore covered individuals.

153. Plaintiffs are "persons aggrieved" because they were subjected to the deprivation of rights created, granted, or protected by § 8-802 by covered individuals, including their rights to be free from unreasonable search and seizure and excessive force.

154. Columbia and/or AUS are liable as the employer(s) of the covered individual Defendants.

155. Defendants' use of force against Plaintiffs and the Class was unjustified, unlawful, and objectively unreasonable in light of the facts and circumstances confronting them.

156. As a result, Defendants deprived Plaintiffs and the Class of their legal rights, caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses, and otherwise damaged and injured them.

157. It is not a defense to liability under §§ 8-801 et seq. that a covered individual has qualified immunity or any substantially equivalent immunity.

158. Plaintiffs and the Class are entitled to compensatory and punitive damages against all liable Defendants, and to reasonable attorneys' fees and costs, pursuant to Administrative Code § 8-805.

## SECOND CLAIM FOR RELIEF

**False Arrest, False Imprisonment, and Unreasonable Detention (New York Common Law) Against Defendants Shipman, Laguerre, Chang, Garcia, John/Jane Doe Columbia Public Safety Officers 1-25, Columbia, AUS, AUS John/Jane Does 1-10, and Pinkerton.**

159. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

160. The conduct alleged herein was undertaken by individual Defendants while on duty and/or acting within the course and scope of their employment and/or agency for Columbia and/or AUS, cloaked with and/or invoking state power and/or authority; accordingly, Columbia and AUS are each liable to Plaintiffs and the Class under the doctrine of *respondeat superior*.

161. Defendants falsely detained and/or confined Plaintiffs and the Class within the meaning of New York common law, without reasonable or probable cause, without a warrant, and without any right or authority to do so.

162. Plaintiffs and the Class were conscious of their confinement and did not consent to it.

163. As a result, Defendants deprived Plaintiffs and the Class of their legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

## THIRD CLAIM FOR RELIEF

**Assault (New York Common Law)**
**Against Against Defendants Laguerre, Chang, Garcia, John/Jane Doe Columbia Public Safety Officers 1-25, Columbia, AUS, AUS John/Jane Does 1-10, and Pinkerton.**

164. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

165. The conduct alleged herein was undertaken by individual Defendants while on duty and/or acting within the course and scope of their employment and/or agency for Columbia and/or AUS; accordingly, Columbia and AUS are each liable under the doctrine of *respondeat superior*.

166. Defendants committed assault against Plaintiffs and the Class by intentionally placing them in fear of imminent harmful or offensive contact.

167. As a result, Defendants caused Plaintiffs and the Class bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

## FOURTH CLAIM FOR RELIEF

**Battery (New York Common Law)**
**Against Defendants Laguerre, Chang, Garcia, John/Jane Doe Columbia Public Safety Officers 1-25, Columbia, AUS, AUS John/Jane Does 1-10, and Pinkerton.**

168. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

169. The conduct alleged herein was undertaken by individual Defendants while on duty and/or acting within the course and scope of their employment and/or agency for Columbia and/or AUS; accordingly, Columbia and AUS are each liable under the doctrine of *respondeat superior*.

170. Defendants committed battery against Plaintiffs and the Class by intentionally making physical contact with them without their consent.

171. As a result, Defendants caused Plaintiffs and the Class bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

**FIFTH CLAIM FOR RELIEF**

**Intentional and Negligent Infliction of Emotional Distress (New York Common Law) Against All Defendants**

172. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

173. The conduct alleged herein was undertaken by individual Defendants while on duty and/or acting within the course and scope of their employment and/or agency for Columbia and/or AUS; accordingly, Columbia and AUS are each liable under the doctrine of respondeat superior.

174. Defendants engaged in extreme and outrageous conduct that intentionally and/or negligently caused Plaintiffs and the Class severe emotional distress.

175. Defendants' conduct was the direct and proximate cause of injury and damage to Plaintiffs and the Class and violated their statutory and common law rights under New York law.

**SIXTH CLAIM FOR RELIEF**

**Violations of the New York State Constitution, Article I, §§ 6, 8, 9, 11, and 12 Against All Defendants**

176. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

177. The conduct alleged herein was undertaken by individual Defendants while on duty and/or acting within the course and scope of their employment and/or agency for Columbia and/or AUS; accordingly, Columbia and AUS are each liable under the doctrine of *respondeat superior*.

178. Defendants, acting under color of law, violated Plaintiffs' and the Class's rights under Article I, §§6 (due process), 8 (freedom of speech), 9 (right of assembly), 11 (equal protection), and/or 12 (search and seizure) of the New York State Constitution.

179. A damages remedy is necessary to effectuate the purposes of these constitutional provisions and to ensure the full realization of Plaintiffs' and the Class's rights thereunder.

## SEVENTH CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest — 42 U.S.C. § 1983 (Fourth and Fourteenth Amendments) Against Defendants Shipman, Laguerre, Chang, Garcia, John/Jane Doe Columbia Public Safety Officers 1-25, Columbia, AUS, AUS John/Jane Does 1-10, and Pinkerton.**

180. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

181. Defendants confined, seized, and caused the arrest of Plaintiffs and the Class without a judicial warrant, without privilege or lawful authority, and without individualized probable cause, including by kettling and physically preventing Plaintiffs and the Class from leaving Room 301, and by summoning and directing law enforcement to effectuate a mass arrest based on Defendants' own unlawful identification and confinement demands.

182. Plaintiffs and the Class did not consent to, and were conscious of, their seizure and confinement.

183. As a result, Defendants deprived Plaintiffs and the Class of their federal and state legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

184. Defendants' conduct was willful, malicious, oppressive, and/or reckless, warranting an award of punitive damages against the individual Defendants.

## EIGHTH CLAIM FOR RELIEF

**Excessive Force — 42 U.S.C. § 1983 (Fourth and Fourteenth Amendments) Against Defendants Shipman, Laguerre, Chang, Garcia, John/Jane Doe Columbia Public Safety Officers 1-25, Columbia, AUS, AUS John/Jane Does 1-10, and Pinkerton.**

185. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

186. Defendants' use of force against Plaintiffs and the Class was unjustified and objectively unreasonable under the totality of the facts and circumstances confronting them.

187. As a result, Defendants deprived Plaintiffs and the Class of their federal and state legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

188. Defendants' conduct was willful, malicious, oppressive, and/or reckless, warranting an award of punitive damages against the individual Defendants.

## NINTH CLAIM FOR RELIEF

### Violation of the First Amendment — 42 U.S.C. § 1983
### Against All Defendants

189. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

190. At the direction of the federal government and in cooperation with local law enforcement, Defendants imposed restrictions on speech and expressive conduct protected by the First Amendment, including by subjecting Plaintiffs and the Class to excessive force, unlawful confinement, and discriminatory identification demands and unprecedented extreme disciplinary sanctions because of the content and viewpoint of their protest.

191. Defendants' restrictions on Plaintiffs' and the Class's First Amendment rights to participate in, observe, and/or be near protected expressive activity: (a) were viewpoint-discriminatory and/or not content-neutral, and were not necessary and precisely tailored to serve a compelling governmental interest by the least restrictive means; or (b) were content-neutral but not narrowly tailored to serve a significant governmental interest, and substantially burdened more speech than necessary without adequate alternative channels; and/or (c) afforded Defendants unbridled discretion to limit protected conduct, raising due process vagueness and overbreadth

concerns; and/or (d) imposed strict liability on Plaintiffs and the Class for engaging in protected speech.

192. As a result, Defendants deprived Plaintiffs and the Class of their federal and state legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

193. Defendants' conduct was willful, malicious, oppressive, and/or reckless, warranting an award of punitive damages against the individual Defendants.

## TENTH CLAIM FOR RELIEF

### First Amendment Retaliation — 42 U.S.C. § 1983
### Against All Defendants

194. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

195. Plaintiffs and the Class engaged in speech and conduct protected by the First Amendment.

196. Defendants retaliated against Plaintiffs and the Class for that protected speech and conduct, including by subjecting them to excessive force, false arrest, unlawful confinement, and disproportionate discipline, in an effort to punish, deter, and chill Plaintiffs' and the Class's continued exercise of their First Amendment rights.

197. Upon information and belief, at the direction of the federal government and with the participation of special patrolmen under control of the police commissioner, Defendants Columbia, AUS and Pinkerton designed and/or implemented policies and practices pursuant to which those who ordered, effected, or participated in the conduct alleged herein subjected Plaintiffs and the Class to these First Amendment violations, with malice and in response to the particular viewpoint expressed by Plaintiffs' and the Class's protest.

198. As a result, Defendants deprived Plaintiffs and the Class of their federal and state legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

199. Defendants' conduct was willful, malicious, oppressive, and/or reckless, warranting an award of punitive damages against the individual Defendants.

## ELEVENTH CLAIM FOR RELIEF

### Due Process — 42 U.S.C. § 1983 (Fourteenth Amendments)
### Against All Defendants

200. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

201. At all relevant times, Plaintiffs held constitutionally protected property interests in their continued enrollment and degree progress at Columbia, arising from their implied contractual relationship with Columbia under the CRUC, the University Charters and Statutes, and the Guidelines thereto, as well as in the specific academic, financial, and employment benefits tied to that enrollment, including but not limited to: Ms. Rubin's fellowship from Columbia's Heyman Center for the Humanities and her student employment, which was her sole source of income and health insurance; Ms. Khokhar's $235,332 scholarship and financial aid award and her acceptance into a competitive dual-degree program with a French university; and Mr. Buchanan's student employment, which was a significant source of his income and health insurance.

202. Plaintiffs further held a liberty interest in their reputations, given that the disciplinary charges and sanctions brought against them were pursued amid extensive national media attention and public statements by federal officials characterizing the May 7 demonstrators in stigmatizing and inflammatory terms, including Secretary of State Rubio's public statement that the demonstrators were "Pro-Hamas thugs [who] are no longer welcome in our great nation," and

then president Shipman's public statement referring to the teach-in as antisemitic, inextricably linking Plaintiffs' identities and reputations to those characterizations without any opportunity to clear their names.

203. Defendants enforced the demand that protesters identify themselves or be confined, and the disproportionate sanctions levied against the Disciplinary Subclass in a manner that was unconstitutionally vague and/or overbroad, affording officials standardless discretion to detain, arrest, charge, and sanction Plaintiffs and the Class on an ad hoc basis without fair warning.

204. As to the Disciplinary Subclass, Columbia's disciplinary proceedings were conducted by a UJB unlawfully reconstituted at the direction of the federal government, in violation of Columbia's own governing Statutes; denied access to exculpatory CCTV evidence, selective portions of which were heavily relied on by Defendant Wawro in prosecuting the disciplinary charges; drew adverse inferences from the exercise of the right against self-incrimination; failed to permit questioning of witnesses, and imposed sanctions grossly disproportionate to any prior precedent — collectively depriving members of the Disciplinary Subclass of the process due to them under the Fourteenth Amendment, in light of the state action created by federal coercion of Columbia's disciplinary process.

205. As a result, Defendants deprived Plaintiffs and the Class of their federal and state legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

206. Defendants' conduct was willful, malicious, oppressive, and/or reckless, warranting an award of punitive damages against the individual Defendants.

## TWELFTH CLAIM FOR RELIEF

**Equal Protection and Selective Enforcement — 42 U.S.C. § 1983 (Fourteenth Amendment) Against All Defendants**

207. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

208. Defendants selectively enforced identification and dispersal demands, and issued extreme, unprecedented disciplinary sanctions against Plaintiffs and the Class because of the pro-Palestinian viewpoint of their protest, while declining to enforce identical or comparable rules against similarly situated students engaged in other protected activity or expressing other viewpoints, including the students who remained in Butler Library studying after its purported closure without being asked to identify themselves.

209. Upon information and belief, at the direction of the federal government and with the participation of special patrolmen under control of the police commissioner, Defendants Columbia, AUS and Pinkerton designed and/or implemented policies and practices pursuant to which the individual Defendants who ordered, effected, and otherwise participated in detaining, arresting, and disciplining Plaintiffs and the Class subjected them to these Equal Protection violations.

210. As a result, Defendants deprived Plaintiffs and the Class of their federal and state legal rights and caused bodily injury, pain, suffering, psychological and emotional injury, humiliation, and costs and expenses.

211. Defendants' conduct was willful, malicious, oppressive, and/or reckless, warranting an award of punitive damages against the individual Defendants.

## THIRTEENTH CLAIM FOR RELIEF

**Breach of Contract**
**Against Columbia**

212. Plaintiffs repeat and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

213. By enrolling at Columbia and paying tuition and fees, Plaintiffs and members of the class including those detained in violating of Columbia's ID policy, entered into an implied contract with Columbia, the terms of which include the CRUC, the University Charters and Statutes, and the Guidelines to the CRUC in effect as of May 7, 2025, pursuant to which Columbia agreed to conduct any disciplinary proceeding arising from protest activity in accordance with those governing documents.

214. Plaintiffs and members of the Disciplinary Subclass performed their obligations under this contract, including payment of tuition and fees and compliance with the terms of their enrollment.

215. Columbia materially breached this contract by, among other things: (a) imposing interim suspensions the day after the protest with no due process in violation of the CRUC; (b) reconstituting the UJB in violation of CRUC § 445(c) and without University Senate approval as required by CRUC § 452(c); (c) denying Plaintiffs and members of the Disciplinary Subclass access to CCTV footage guaranteed by CRUC § 446; (d) failing to provide the record of consistent past sanctioning required by CRUC § 449; (e) drawing adverse inferences from the exercise of the right not to make self-incriminating statements, in violation of CRUC §§ 446-448; (f) imposing sanctions grossly disproportionate to fifty years of consistent precedent for comparable or more extensive protest conduct, at the direction of, and to appease, the federal government rather than through Columbia's own honest, independent discretion.

216. Further, the new identification rule announced by Columbia Public Safety on April 1, 2025 formed part of Columbia's contract with Plaintiffs. The new rule stated that "[i]ndividuals who refuse either to provide ID or facilitate identification will be warned that noncompliance may result in removal from campus" and "[c]ontinued refusal will result in a second warning, a trespass notice, and escort from campus" where "[t]hose who resist removal may be removed by an authorized individual and subject to arrest for trespassing."

217. Plaintiffs were entitled to rely on the plain language of the identification policy under which their refusal to show identification would result in removal from campus – exactly what Plaintiffs demanded for hours while Defendants detained and assaulted them instead of complying with this policy.

218. As a direct and proximate result of Columbia's breaches, Plaintiffs and members of the class suffered detainment, assault, suspension, expulsion, degree revocation, loss of housing and campus employment, delayed graduation, tuition and fee losses, reputational harm, and severe emotional distress.

**DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, demand judgment against Defendants as follows:

I. Certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and certifying the proposed Disciplinary Subclass pursuant to Fed. R. Civ. P. 23(c)(5);

II. Designating Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

III. Compensatory damages against Defendants in an amount to be determined at trial;

IV. Punitive damages against the individual Defendants and, where permitted by law, against Columbia and AUS, in an amount to be determined at trial;

V. A declaration that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments to the United States Constitution, the New York State Constitution, New York City Administrative Code §§ 8-801 et seq. and 14-189, and New York common law;

VI. An injunction against Defendants' continuing the unconstitutional policies, practices, and customs alleged herein;

VII. As to the Disciplinary Subclass, compensatory damages for Columbia's breach of contract in connection with the disciplinary process described herein, without prejudice to the annulment and reinstatement relief separately sought in the pending Article 78 proceeding referenced above;

VIII. Statutory and reasonable attorneys' fees, expert fees, disbursements, and costs of this action pursuant to, inter alia, 42 U.S.C. § 1988, N.Y.C. Admin. Code §§ 8-805 and 14-189, and; and

IX. Such other and further relief as the Court may deem equitable, just, and proper.

Dated: September 18, 2026
New York, New York

**THE ABOUSHI LAW FIRM PLLC**

BY: ______________________

Tahanie A. Aboushi
1441 Broadway 5th Floor
New York, New York 10018
(212)391-8500
Tahanie@aboushi.com

**FORCHILLI LAW PLLC**

By: ______________________________
Cheryl E. Forchilli
305 Broadway Ste. 700
New York, New York 10007
(813) 966-8466
Cheryl@Forchillilaw.com

**RITCHIN LAW PLLC**

By: ______________________________
Ezra Ritchin
367 St. Marks Ave, #1132
Brooklyn, NY 11238
(917) 725-0116
ezra@ritchinlaw.com

**COHEN&GREEN P.L.L.C.**

By: ______________________________
BY: Elena L. Cohen
J. Remy Green
Regina J. Yu
Leena M. Widdi
1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
t: (929) 888-9480
elena@femmelaw.com
remy@femmelaw.com
regina@femmelaw.com
leena@femmelaw.com

**GIDEON ORION OLIVER**

By: ______________________________
Gideon Orion Oliver
277 Broadway, Suite 1501
New York, NY 10007
(718) 783-3682 x5
Gideon@gideonlaw.com

**KELLY JO POPKIN PLLC**

By: ___/s_______________________
Kelly Jo Popkin
60-84 Catalpa Ave, Apt. 1R
Ridgewood, NY 11385
(917) 648-0838
Kelly.jo.popkin@gmail.com

*Attorneys for Plaintiffs*